**WO**

NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Moorehead,<br><br>        Plaintiff,<br><br>v.<br><br>Hi-Health Supermart Corporation,<br><br>        Defendant. | No. CV-14-02542-PHX-JJT<br><br>**ORDER** |

At issue is Defehendant's Motion for Summary Judgment (Doc. 76, Mot. Summ. J.), to which Plaintiff filed a Response (Doc. 84, Resp.), and Defendant filed a Reply (Doc. 87, Reply). Because the parties' briefs were adequate for the Court to resolve the issues arising in Defendant's Motion, the Court finds this matter appropriate for decision without oral argument. *See* LRCiv 7.2(f). For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment.

**I.    BACKGROUND**

Plaintiff Christine Moorehead (hereinafter "Plaintiff") claims Defendant Hi-Health Supermart Corporation (hereinafter "Defendant") violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, by retaliating against her for engaging in protected activity, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*, by discriminating against her based on age. (Doc. 56, Am. Compl. ¶ 1.)[1]

---

[1] The operative complaint is Plaintiff's Amended Complaint, (Doc. 56). Plaintiff originally filed a Complaint on November 17, 2014, (Doc. 1), to which Defendant filed an Answer on December 9, 2014, (Doc. 7).

Defendant "owns and operates stores throughout Arizona that sell high-quality vitamins and nutritional supplements, and other health-related items." (Doc. 77, DSOF ¶ 1.) Plaintiff was employed as a Buyer and Senior Buyer by Defendant from January 30, 1995, until she was terminated on March 30, 2012. (Am. Compl. ¶ 9; DSOF ¶ 2.)

Plaintiff's original direct supervisor was Eric Sielaff, who was later replaced by Jill Lansdale. (Doc. 84, PSOF ¶¶ 112, 116.) After Ms. Lansdale left Hi-Health in June 2007, Plaintiff reported to Jay Chopra and continued to do so throughout her remaining tenure at Hi-Health. (PSOF ¶¶ 118–119.) Although Mr. Chopra placed Plaintiff on a performance improvement plan ("PIP") in September 1997 "to address significant shortfalls between her targeted and actual gross profit numbers for several product categories," Plaintiff was later promoted to Senior Buyer in December 1997, retaining this position until her termination in March 2012. (DSOF ¶¶ 7–8, 20.)

As a Buyer, Plaintiff was "responsible for sourcing, pricing, promotion and other management activities for products in [her] assigned product categories." (DSOF ¶ 9.) According to Defendant, "Buyers are assigned many [product] categories (consisting of thousands of items) and a Buyer's categories occasionally change based on business needs and when new Buyers are hired or depart." (DSOF ¶ 12.) Defendant asserts that it "measures the performance of its Buyers based on achievement of assigned business targets, and gross profit targets, for their [product] categories," but "does not measure their job performance based upon the gross profits from the categories assigned to that Buyer." (DSOF ¶¶ 13, 15.) Accordingly, Defendant evaluates its Buyers "based on reaching a set amount of sales and a set amount of gross profit dollars as compared with last year's sales and last year's gross profit dollars," emphasizing the "percentage of increase based upon the preset gross profit goal." (DSOF ¶¶ 16–17.) Plaintiff, however, alleges that Simon Chalpin, the president of Hi-Health, and Mr. Chopra told her "that her performance was measured by the gross profits that her product categories generated by means of sales."[2] (PSOF ¶ 13.)

---

[2] Plaintiff claims that the assignment of product categories was not neutral because

In April 2000, Plaintiff was called as a witness in a sex discrimination suit brought by her former supervisor, Ms. Lansdale, against Hi-Health. (DSOF ¶ 23; PSOF ¶ 123.) Plaintiff "testified in her deposition and again at trial as a witness in Ms. Lansdale's case-in-chief . . . that she heard Simon Chalpin make discriminatory comments in the workplace about women." (PSOF ¶ 124.) Mr. Chopra also testified during the trial on behalf of Mr. Chalpin, (PSOF ¶ 126), but he "was not present when Plaintiff testified," (DSOF ¶ 25). Although Defendant contends that Mr. Chopra "has no knowledge of the contents of Plaintiff's testimony," (DSOF ¶ 25), Plaintiff alleges that "Mr. Chopra knew the content of [Plaintiff's] trial testimony because he directly, specifically, and repeatedly criticized it in the workplace to [Plaintiff]," (PSOF ¶ 25). However, Plaintiff concedes that she "never told Mr. Chopra . . . the contents of her testimony," and Mr. Chopra never asked Plaintiff, nor anyone else, to divulge the contents of Plaintiff's testimony. (DSOF ¶¶ 26–28; PSOF ¶¶ 26–28.)

In Plaintiff's annual review in October 2000, "Mr. Chopra noted numerous areas where improvements were needed, but advised [Plaintiff] to 'stay motivated and encourage[d a] positive attitude.'" (DSOF ¶ 30.) As part of "her self-evaluation for that same period, Plaintiff recognized a need to improve her computer literacy" and focus on

---

Mr. Chopra "manipulated the assignment of . . . categories in order to undermine [Plaintiff's] performance and ultimately terminate her" by assigning her "the most difficult product categories to market." (PSOF ¶ 12.) Further, Plaintiff alleges that Mr. Chopra "assigned [Plaintiff] almost twice as many product categories as Hi-Health's two other Buyers, [and] assigned the more profitable product categories to the youngest Buyer." (PSOF ¶ 12.) However, Defendant asserts that "Plaintiff points to no evidence in the record that Mr. Chopra set her goals unreasonably high" as a "Hi-Health management team (including the CEO and CFO), not Mr. Chopra individually, set the goals." (Reply at 13.) Defendant further contends that Plaintiff's "claim that 'Mr. Chopra imposed higher monthly marginal ["GP$"] increase requirements on [her] than those imposed on her younger counterparts at Hi-Health' grossly misstates Mr. Chopra's testimony." (Reply at 13.) Rather, Mr. Chopra "testified that Plaintiff, the higher paid Senior Buyer, was responsible for more *categories* (and therefore more GP$) than the junior Buyer, but explicitly explained that 'their evaluation is done based upon . . . [the] increase over the plan,'" not the GP$ money total. (Reply at 13–14.) Defendant asserts Plaintiff "ignores the facts that she was the only Senior Buyer and was paid more than the junior Buyer." (Reply at 14 n.14.) Furthermore, "[u]nder Hi-Health's category-growth expectation, if that younger Buyer fails to increase GP$ in . . . [a] category, she fails her performance goal, regardless of how profitable [that category] was at the time it was assigned." (Reply at 15.)

her categories. (DSOF ¶ 31.) In June and July 2001, Mr. Chopra approved a bonus for Plaintiff, and later gave Plaintiff a raise in 2003 "to compensate her for the additional work she had taken on." (DSOF ¶¶ 32–33.) When Plaintiff failed to meet her performance goals shortly thereafter, Mr. Chalpin "wanted to withhold Plaintiff's bonus and hold her salary at the prior year's amount." (DSOF ¶ 34.) Nonetheless, Mr. Chopra "questioned Mr. Chalpin's decision, and obtained an increase for Plaintiff." (DSOF ¶ 34.) Plaintiff also received a raise and favorable review from Mr. Chopra in 2005. (DSOF ¶ 35.) However, in both 2006 and 2007, Plaintiff "failed to meet targets, was below her gross profit performance from the prior year, and did not receive a raise." (DSOF ¶¶ 36–37.) From November 2000 through August 2011, Plaintiff was disciplined on six occasions after disregarding Hi-Health policy and procedure.[3]

---

[3] First, a memo dated November 7, 2000 by Mr. Chopra indicates that Plaintiff submitted a proposal to a vendor "for co-op advertising in the amount of $7,000 for a 6 month period" when the amount received from the same vendor "for the same period was $14,000 a year ago." (Doc. 77-2, Nov. 2000 Discipline Memo at 250–51.) Mr. Chopra notes that this "proposal was sent to this vendor without [his] approval or knowledge," and indicates that he had previously counseled Plaintiff two months before that Hi-Health is "looking to equal or increase co-op advertising $'s [sic] from each manufacturer," after she had sent a similar decrease in co-op monies to another vendor. (Nov. 2000 Discipline Memo at 251.) Second, according to a memo dated May 3, 2001, Plaintiff had "pointed to Jay Chopra's office" after a conversation regarding product returns and "very loudly said[,] 'why is he never held responsible for the things he does wrong[.]'" (Doc. 77-2, May 2001 Discipline Memo at 253.) This discipline memo was completed by a Hi-Health employee by the name of Cheri, not by Mr. Chopra. (May 2001 Discipline Memo at 253.) Third, "[i]n August 2004, a potential vendor emailed Hi-Health to complain of rude treatment by Plaintiff." (DSOF ¶ 40.) This potential vendor stated that she "was offended by the ungracious and flippant manner in which [she] was spoken to by [Plaintiff]." (Doc. 77-2, Aug. 2004 Disciplinary Memo at 258.) Mr. Chopra indicated that he spoke to Plaintiff and "made clear that under no circumstance is she to be unprofessional or rude to a vendor." (Aug. 2004 Discipline Memo at 255.)
 Fourth, "[i]n August 2008, Plaintiff . . . sign[ed] a vendor agreement on behalf of Hi-Health in violation of the company's signature policy and subjected Hi-Health to potential legal exposure." (DSOF ¶ 41). After Mr. Chopra emailed Plaintiff and other employees to "clarify that [they] are not authorized to approve or exclusively sign vendor agreements, contracts and other documents representing Hi-Health," Plaintiff indicated in an email response that she "understand[s] and acknowledge[s] the authorized signature policy." (Doc. 77-2, Aug. 2008 Discipline Memo at 262.) Fifth, "[i]n February 2010, Plaintiff received written counseling for not following procedure for updating vendor information." (DSOF ¶ 42.) Plaintiff acknowledged "the problem [this] could cause" and assured that "it certainly wo[uld]n't happen again." (Doc. 77-2, Feb. 2010 Discipline Memo at 264.) Finally, in August 2011, Plaintiff allowed a vendor "to hand out product training information" containing unsubstantiated claims "to store managers without approval" from Mr. Chopra, subjecting Hi-Health to potential "financial penalties." (Doc. 77-2, Aug. 2011 Discipline Memo at 266.)

"In 2011, Hi-Health restructured its management" and "implemented revised business targets and goals designed to be 'more in line with' last year's numbers." (DSOF ¶¶ 44–45.) Mr. Chopra met with Plaintiff and the other Buyers in October 2011 to "explain the revised business methodology and communicate Hi-Health's expectation that, in the coming fiscal year (beginning November 2011), they will be held accountable for meeting their targets." (DSOF ¶ 50.) "In November 2011, Plaintiff earned a 'marginal' score ('2.5 out of 5') on her 2011 annual performance evaluation," was "14% under her 2011 goal for gross profit dollars[,] and exhibited 'questionable' item selection and product 'launch strategies.'" (DSOF ¶¶ 51–52; Doc. 77-2, 2011 Annual Review at 268.) As part of this 2011 performance evaluation, "Mr. Chopra individually reviewed Plaintiff's previous performance and upcoming performance targets with her." (DSOF ¶ 55.) In January 2012, "Plaintiff signed the 'Category Manager 2012 Incentive Plan,' acknowledging its receipt and contents"; this Plan "expressly warned of the consequences for poor performance," including placement on a PIP, with lack of improvement potentially leading to termination. (DSOF ¶¶ 58–59.)

On February 6, 2012, Mr. Chopra met with Plaintiff and placed her on a 60-day PIP because "Plaintiff was more than 13% below her gross profit numbers plan" following the first quarter of the 2012 fiscal year. (DSOF ¶¶ 61–62.) By signing the PIP, Plaintiff acknowledged that the "PIP required [her] to increase her gross profit numbers and bring them up to plan," and specifically warned that "failure to improve her performance" could lead to termination. (DSOF ¶¶ 63–65.) "Plaintiff continued to have trouble meeting her numbers and complained to her co-workers about the objective methodology," so "Mr. Chopra again met with the entire department, including Plaintiff, to explain the logic and process for determining gross profit measurements" on February 28, 2012. (DSOF ¶¶ 66–67.)

"On March 6, 2012, Mr. Chopra and Joy Salenger-Robinson, General Manager of Merchandising, met with Plaintiff to discuss her progress towards the objectives set by her PIP." (DSOF ¶ 68.) Despite the fact that "Hi-Health, as a whole, had an overall

increase of 7%" over the prior month, "Plaintiff was still 13% below plan." (DSOF ¶ 69.) At this meeting, "Plaintiff acknowledged that she was facing termination, and asked whether she should attend an upcoming trade show." (DSOF ¶ 70.) In response, Mr. Chopra indicated that "he wanted her to succeed just like the rest of Hi-Health, and assured her that he want[ed] her to attend the trade show, which she did." (DSOF ¶ 71.)

Over the course of the second 30-days of her PIP, Plaintiff was still 4.6% below her gross profit plan number, failing to "improve to plan." (DSOF ¶ 72.) "In total, Plaintiff was 9% below plan for the PIP period," and "also failed each of the other . . . requirements of the PIP" which included creating promotions, adding new products with specialty formulas, and improving her four worst-performing categories to meet plan by the end of the PIP. (DSOF ¶¶ 73–74.) Accordingly, "Mr. Chopra made the decision to terminate Plaintiff because she could not consistently increase gross profit dollars year-over-year, did not meet her objective performance requirements for five consecutive months preceding her termination, and failed the [PIP]." (DSOF ¶ 77.)

In the Amended Complaint, Plaintiff seeks "equitable relief and money damages for age discrimination and retaliation in the workplace." (Am. Compl. ¶ 1.) Plaintiff claims "Mr. Chopra ultimately discriminatorily terminated [Plaintiff] on March 30, 2012 based on her age and her previous adverse trial testimony in the *Lansdale* case." (Am. Compl. ¶ 42.) Specifically, Plaintiff alleges that after she testified, "both Mr. Chalpin and Mr. Chopra refused to look at [her] or speak to her at work," (Am. Compl. ¶ 24), and "Mr. Chopra commenced a pattern of regularly falsely claiming to Mr. Chalpin that she was not performing her job duties adequately," (Am. Compl. ¶ 31). Plaintiff also states that "around the time that [she] celebrated her sixtieth birthday in July 2011, Mr. Chopra started to make derogatory comments based upon her age and linked her age with what he (falsely) claimed to be poor job performance." (Am. Compl. ¶ 35.) Plaintiff alleges Mr. Chopra said:

- "I know you're older, but you need to come into the 21st Century";
- "I know you've been around a long time and you're

- 6 -

> older than the other buyers, but you still should be able to come up with some new ideas";
> - "I know you're older than the other buyers, but that shouldn't stop you from being innovative and creative";
> - "Other people in the company as well as myself look around and wonder whether or not you can keep up with the other younger buyers"; and,
> - "I know you're over 60 now but, you still need to keep up with the other younger buyers, if not, this job might not be for you."

(Am. Compl. ¶ 36.)

On June 22, 2015, Defendant filed an Answer to Plaintiff's Amended Complaint denying retaliation or age discrimination against Plaintiff. (Doc. 57, Answer to Pl.'s Am. Compl. ¶ 42.) Defendant filed a Motion for Summary Judgment on Plaintiff's claims of Title VII retaliation and ADEA discrimination on March 21, 2016, contending there is no genuine dispute as to material fact that "Hi-Health neither retaliated against Plaintiff for her 2000 testimony nor discriminated against her based on her age." (Mot. Summ. J. at 5.) Rather, "Hi-Health terminated Plaintiff when she was unable to meet her assigned business targets and other objectives." (Mot. Summ. J. at 5.) Defendant continues:

> Unwilling to accept personal responsibility for the consequences of her poor performance, Plaintiff now blames Hi-Health's COO for her termination. . . . Plaintiff's only evidence of unlawful motivation is her own, self-serving testimony vaguely recounting half-remembered stray remarks Hi-Health's COO may have made over the years. This testimony simply does not satisfy Plaintiff's *prima facie* burden, let alone establish a triable issue of fact in light of the undisputed, objective evidence of her poor performance.

(Mot. Summ. J. at 5.)

Plaintiff filed a Response opposing Defendant's Motion for Summary Judgment on May 17, 2016. (Resp. at 18.) Plaintiff's Response claims Mr. Chopra's "ten year history of making harassing remarks based on [Plaintiff's] trial testimony" is evidence of his retaliatory animus, and, therefore, "supports finding a causal connection between her protected activity and her ultimate termination." (Resp. at 14.) Plaintiff's Response

- 7 -

further alleges that Mr. Chopra's series of remarks about Plaintiff's age "reflect Jay Chopra's discriminatory attitude and explicitly link[] [Plaintiff's] age to her work performance," thereby "constitut[ing] 'direct evidence' of Mr. Chopra's discriminatory animus against [Plaintiff] based upon her age." (Resp. at 16.)

On June 20, 2016, Defendant filed a Reply in support of its Motion for Summary Judgment, asserting that Plaintiff is unable to establish *prima facie* cases of retaliation or ADEA age discrimination because "Mr. Chopra's remarks do not support a causal inference of retaliation under the stringent 'but-for' test" nor constitute "direct evidence of ageism[] justifying escape from *McDonnell Douglas*." (Reply at 5.) Defendant also asserts that, even if Plaintiff could establish the *prima facie* elements of age discrimination under the ADEA, she fails to demonstrate any genuine issues of material fact with regard to pretext, "thereby again failing her *McDonnell Douglas* burden and entitling [Defendant] to summary judgment." (Reply at 5.)

## II. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not

merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a question of material fact. *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

### B.   Title VII Retaliation

Defendant first moves for summary judgment on Plaintiff's Title VII Retaliation claim. (Mot. Summ. J. at 11–16.)

#### 1.   Legal Standard

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to discriminate against an employee because that employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Pursuant to the *McDonnell Douglas* framework governing Title VII retaliation claims, "a plaintiff must first establish a *prima facie* case of retaliation." *Cheeks v. Gen. Dynamics*, 22 F. Supp. 3d 1015, 1035 (D. Ariz. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). To establish a *prima facie* case of retaliation, a plaintiff must show that "1) [s]he engaged in a protected activity; 2) [s]he suffered an adverse employment decision; and 3) there was a causal link between the protected activity and the adverse employment decision." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002). "The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."

1 *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted). "If [the
2 plaintiff] provides sufficient evidence to show a *prima facie* case of retaliation, the
3 burden then shifts to the [defendant] to articulate a legitimate, non-retaliatory reason for
4 its actions." *Porter v. California Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005) (citing
5 *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000)). "Once the defendant has
6 presented a purpose for the action, the plaintiff bears the ultimate burden of providing
7 evidence that the defendant's reason is 'merely a pretext for a retaliatory motive.'"
8 *Cheeks*, 22 F. Supp. 3d at 1035 (quoting *Porter*, 419 F.3d at 894).

### 2. Analysis

It is undisputed that Plaintiff satisfies the first two elements of a *prima facie* retaliation claim. (*See* Mot. Summ. J. at 12; Resp. at 12.) Specifically, Defendant concedes that "Plaintiff engaged in a protected activity—testifying in a suit involving Hi-Health," and later, "[o]n March 30, 2012, Plaintiff was terminated—an adverse employment action." (Mot. Summ. J. at 12.) Defendant, however, contends that Plaintiff cannot establish the causation element of a *prima facie* retaliation claim because Plaintiff "cannot prove that her testimony [in the *Lansdale v. Hi-Health* suit] was the but-for cause of her termination." (Mot. Summ. J. at 12.) Rather, Defendant argues that "[t]he 12-year gap [between the protected activity and the adverse employment action], as a matter of law, precludes a causal inference," especially where "there is insufficient additional evidence of retaliatory motive to overcome the 12-year time gap." (Mot. Summ. J. at 12.)

"Title VII retaliation claims must be proved according to traditional principles of but-for causation" which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). "Accordingly, Plaintiff must show that she would not have suffered the adverse employment action but-for" her testimony in 2000 in the *Lansdale v. Hi-Health* suit. *Cheeks*, 22 F. Supp. 3d at 1036. Specifically, Plaintiff "must provide evidence–either direct or circumstantial–that the individuals responsible for the adverse employment action *knew* about the protected

- 10 -

activity and *intended* to retaliate based on it." *Johnson v. Fed. Express Corp.*, No. CV-14-02428-PHX-DGC, 2016 WL 1593811, at *6 (D. Ariz. Apr. 21, 2016) (citations omitted).

The evidence indicates that Mr. Chopra, the individual responsible for the adverse employment action, knew Plaintiff testified on behalf of a former Hi-Health employee in a sex discrimination suit—a protected activity—though he was unaware of the contents of Plaintiff's testimony. (DSOF ¶¶ 23, 25–29.) However, despite evidence of Mr. Chopra's knowledge of the protected activity, there is no evidence indicating that retaliation for this testimony was a motivating factor in Mr. Chopra's decision to terminate Plaintiff, much less the but-for cause of Plaintiff's termination. Rather, the evidence indicates that Plaintiff's poor work performance and disregard for Hi-Health policy and procedure led to Mr. Chopra's decision to fire Plaintiff. Specifically, as Defendant points out, Plaintiff admitted that "at least as of October 2011, Hi-Health clearly communicated the expectation and policy that, in the upcoming fiscal year, all Buyers must meet objective performance goals consisting of specified gross profit dollars ("GP$") increase, and failure to do so would lead to a PIP and termination." (Reply at 12; *see* PSOF ¶¶ 45, 50–53, 55, 58–76.) Further, Plaintiff admitted that "Hi-Health followed its procedures, placed her on a PIP, and terminated her after she failed it." (Reply at 12; *see* PSOF ¶¶ 44-78.) Plaintiff also "concedes by silence that poor performance and a failed PIP are legitimate, nondiscriminatory reasons for termination." (Reply at 12; *see* Resp. at 11–17.)

Plaintiff broadly claims that Mr. Chopra's "ten year history of making harassing remarks based on [Plaintiff's] trial testimony" is evidence of his retaliatory animus, and, therefore, "supports finding a causal connection between her protected activity and her ultimate termination." (Resp. at 14.) However, Defendant correctly notes that Plaintiff premises her Title VII retaliation claim "on a *single* protected activity—testifying in the *Lansdale* suit in 2000—and a *single* adverse employment action—her termination 12 years later." (Reply at 5, n.1.) Accordingly, those facts and arguments are generally outside the scope of Plaintiff's retaliation claim. Specifically, the Court cannot consider

1 Plaintiff's allegations that Mr. Chopra made harassing remarks regarding other "related
2 protected activity" (such as Plaintiff's involvement in litigation beyond *Lansdale*), (Resp.
3 at 3-5, 14), or Plaintiff's accusations "of post-protected activity 'harassment'" because
4 "her retaliation charge is solely predicated on Mr. Chopra's supposed animus," (Reply at
5 5, n.1).

6 Plaintiff offers the following comments by Mr. Chopra as evidence of
7 Mr. Chopra's retaliatory animus: "You are the only employee who testified against Sy";
8 "How could you have testified the way you did?"; "You're the only person who believes
9 that Sy discriminated against these women." (PSOF ¶ 144.) However, even viewing this
10 evidence in the light most favorable to Plaintiff, the Court finds that it fails to
11 demonstrate that Plaintiff's termination occurred after circumstances giving rise to an
12 inference of retaliation. "[S]tray remarks are insufficient to establish discrimination."
13 *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990). Here, Mr. Chopra's
14 comments were not tied directly to Plaintiff's termination and are "weak circumstantial
15 evidence of discriminatory animus" toward Plaintiff. *Nesbit v. Pepsico, Inc.*, 994 F.2d
16 703, 705 (9th Cir. 1993). Specifically, these remarks are "unrelated to the decisional
17 process," and "insufficient to demonstrate that the employer relied on illegitimate
18 criteria." *Smith v. Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989).
19 Without more, Plaintiff has not made a sufficient showing that the decision to terminate
20 her employment was based on retaliation for her participation as a trial witness in the
21 *Lansdale* case. Accordingly, as Defendant states, "[n]one of the three alleged comments
22 has anything to do with her ultimate termination, and they do not support an inference of
23 but-for causation." (Reply at 7.)

24 Further, Plaintiff's termination is too far removed from the protected activity to
25 establish a causal link by temporal proximity. Although "timing alone will not show
26 causation in all cases, . . . 'to support an inference of retaliatory motive, the termination
27 must have occurred fairly soon after the employee's protected expression.'" *Villiarimo*,
28 281 F.3d at 1065 (finding that "[a] nearly 18–month lapse between protected activity and

- 12 -

an adverse employment action is simply too long, by itself, to give rise to an inference of causation.") (quoting *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000)). An inference is not possible here, where approximately 12 years have lapsed between the date of Plaintiff's testimony and her termination. *See, e.g., Manatt v. Bank of Am., NA*, 339 F.3d 792, 802 (9th Cir. 2003) (finding no evidence of causation where approximately nine months lapsed between the date of the plaintiff's complaint and the defendant's alleged adverse decisions).

Moreover, in the period of time between Plaintiff's testimony in the *Lansdale* case and Mr. Chopra's decision to terminate her, Mr. Chopra "awarded Plaintiff multiple positive reviews and raises[,] and even successfully challenged Mr. Chalpin's 2004 decision to cancel a bonus and raise he had approved" for Plaintiff. (Reply at 8, n.7.) Accordingly, Plaintiff is unable to establish a *prima facie* case of retaliation due to these breaks in the causal chain. *See Ghirmai v. Nw. Airlines, Inc.*, 131 F. App'x 609, 611 (9th Cir. 2005) (holding that intervening events between the plaintiff's protected activity and his termination, such as "positive reviews and assistance, break the causal connection"). As Plaintiff has not shown that her trial testimony in the *Lansdale* case was the but-for cause of her termination twelve years later, Plaintiff has failed to establish a *prima facie* case of retaliation. Accordingly, the Court will grant Defendant's Motion for Summary Judgment as to Plaintiff's Title VII Retaliation claim.

Although Plaintiff's failure to meet her *prima facie* burden renders moot the remainder of the *McDonnell Douglas* burden-shifting analysis, the Court notes that "the substantial evidence (including Plaintiff's own admissions) of Plaintiff's poor job performance . . . constitute[s] a legitimate, non-retaliatory reason for Defendant's action." *Drottz v. Park Electrochemical Corp.*, No. CV 11-1596-PHX-JAT, 2013 WL 6157858, at *15 (D. Ariz. Nov. 25, 2013). Defendant has articulated a "legitimate, nondiscriminatory reason for its adverse employment decision," by "clearly set[ting] forth through the introduction of evidence, reasons for its employment decision which, if believed by the

1 trier of fact, would support a finding that the employment action was not a result of
2 unlawful discrimination." *Noyes v. Kelly Servs.*, 488 F.3d 1163 (9th Cir. 2007).

In addition, Plaintiff has not shown pretext. The Court agrees with Defendant that because "Plaintiff lacks 'specific' or 'substantial' evidence calling into genuine dispute these material facts, a reasonable factfinder simply cannot conclude that Hi-Health's reason for terminating Plaintiff—poor performance and a failed PIP—is 'unworthy of credence because it is internally inconsistent or otherwise not believable.'" (Mot. Summ. J. at 16–17 (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000.)) Accordingly, even if she had met her *prima facie* burden, Plaintiff still would have failed to demonstrate a genuine dispute of material fact as to Defendant's legitimate non-discriminatory reason for Plaintiff's termination or as to pretext.

**C.    Age Discrimination under the ADEA**

**1.    Legal Standard**

Defendant next moves for summary judgment as to Plaintiff's ADEA claim. (Mot. Summ. J. at 17-21.) Under the ADEA, it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Courts analyze ADEA claims differently depending on whether the claim relies on direct or circumstantial evidence. *See Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004). In this instance, Plaintiff claims that Mr. Chopra made various comments related to her age, namely: "I know you're older, but you need to come into the 21st Century"; "I know you've been around a long time and you're older than the other buyers, but you still should be able to come up with some new ideas"; "I know you're older than the other buyers, but that shouldn't stop you from being innovative and creative"; "Other people in the company as well as myself look around and wonder whether or not you can keep up with the other younger buyers"; and "I know you're over 60 now but, you still need to keep up with the other younger buyers, if not, this job might not be for you." (PSOF ¶ 153.) Plaintiff also

alleges Mr. Chopra "asked me if I was able to keep up, make my sales and gross margin projections and get up to the level of the other younger buyers." (DSOF ¶ 97.)

Defendant argues that (1) under Ninth Circuit precedent, these statements do not constitute direct evidence of discriminatory intent because Plaintiff proffers no evidence that the remarks about her age were directly tied to the alleged adverse action, Plaintiff's termination, and (2) even if the Court were to draw inferences in Plaintiff's favor—an act that itself would indicate the evidence is indirect and circumstantial—the link between the remarks and Plaintiff's termination is so weak that the Court must apply the *McDonnell Douglas* framework to Plaintiff's ADEA claim. (Reply at 8-12.) The Court agrees. As Defendant points out, the comments Plaintiff states Mr. Chopra made were all oriented toward Plaintiff meeting her performance targets, and no evidence supports the conclusion that the stray remarks regarding Plaintiff's age were directly tied to Defendant's termination of Plaintiff. The Court thus concludes that the statements are weak circumstantial evidence requiring application of the *McDonnell Douglas* framework. *See France v. Johnson*, 795 F.3d 1170, 1173 (9th Cir. 2015); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918-19 (9th Cir. 1996); *Nesbit*, 994 F.2d at 705; *Merrick*, 892 F.2d at 1438.

### 2. Analysis

To make out an ADEA claim based on circumstantial evidence of discrimination, Plaintiff must first establish a *prima facie* case by demonstrating she was "(1) at least forty years old, (2) performing [her] job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age discrimination." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). Defendant argues that Plaintiff cannot demonstrate elements (2) or (4) because the evidence undisputedly shows that Plaintiff was not performing her job satisfactorily and that she was not discharged under circumstances giving rise to an inference of age discrimination. (Mot. Summ. J. at 13-16.)

1  With regard to Plaintiff's job performance, Defendant points to undisputed
2 evidence that Plaintiff did not meet objective performance goals in late 2011 and early
3 2012 or the PIP Defendant placed her on, leading to her termination. (DSOF ¶¶ 45-85.)
4 Plaintiff testified that, during that period, the basis upon which her performance was
5 measured changed from gross profit to monthly marginal gross profit increase, and that
6 change constituted manipulation of the performance goals intended to cause her to fail.[4]
7 (PSOF ¶¶ 177-80.) However, Plaintiff does not cite any evidence to show that the new
8 performance goals were not objectively reasonable, that Defendant did not apply the new
9 performance goals to all the Buyers at the same time such that the goals were not
10 objective, or that Defendant did not adequately communicate the performance goals or
11 PIP with her. As a result, a conclusion that the evidence shows the new performance
12 goals were manipulation on the part of Defendant would be more than an inference; it
13 would be speculation. Plaintiff thus has not raised a genuine issue of material fact
14 regarding her less-than satisfactory job performance prior to her termination.

15  A review of the evidence regarding the circumstances of Plaintiff's discharge
16 leads to a similar result. Plaintiff again relies on the Mr. Chopra's statements regarding
17 her age, but, as the Court already noted, those statements were directed toward her
18 performance compared to other Buyers and her ability to meet objective performance
19 goals. She does not point the Court to any evidence that she was replaced by substantially
20 younger Buyers, and her contention that another Buyer was given an extra month to reach
21 her performance goals and then not fired is immaterial, because the evidence shows that
22 Buyer successfully completed her PIP and met her goals, unlike Plaintiff. (DSOF ¶ 83.)
23 No evidence or reasonable inferences therefrom could lead a factfinder to conclude that

---

[4] In her Response to Defendant's Motion, Plaintiff does not argue that there remains a genuine dispute of material fact as to whether she performed her job satisfactorily prior to her termination or whether she was discharged under circumstances giving rise to an inference of age discrimination, because she argues that Mr. Chopra's remarks regarding her age were not circumstantial, but rather direct, evidence of discrimination—a proposition with which the Court disagrees. But the Court looks to the evidence proffered by Plaintiff to determine whether she has created a genuine dispute of material fact to resist summary judgment.

- 16 -

Plaintiff's termination was a result of age discrimination instead of poor performance; indeed, the evidence shows Plaintiff acknowledged her need to improve her performance prior to her termination. (DSOF ¶¶ 53-54.) Because Plaintiff does not raise a genuine issue of material fact regarding two of the elements of a *prima facie* claim of age discrimination under the ADEA, the Court will grant Defendant summary judgment on that claim.

As with Plaintiff's retaliation claim, the Court again notes that, even if it were to find a genuine dispute as to Plaintiff's *prima facie* claim of age discrimination, Plaintiff has not created a genuine dispute as to whether Defendant's legitimate non-discriminatory reason for Plaintiff's termination—poor performance—was pretextual. Plaintiff has not produced specific and substantial evidence to show that poor performance was an internally inconsistent or otherwise unbelievable justification for terminating Plaintiff as a Senior Buyer. *See, e.g.*, *Chuang*, 225 F.3d at 1127. As a result, Defendant is entitled to summary judgment on Plaintiff's age discrimination claim for this additional reason.

**IT IS THEREFORE ORDERED** granting Defendant's Motion for Summary Judgment (Doc. 76) on all of Plaintiff's claims against Defendant.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and close this case.

Dated this 13th day of January, 2017.

Honorable John J. Tuchi
United States District Judge